```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4   STEVEN BENHAYON,              )
                                   )
 5              Plaintiff,         )
                                   )
 6        vs.                      )  No. CV08-06090FMC
                                   )     (AGRx)
 7   ROYAL BANK OF CANADA, a       )
     Canadian company, business    )
 8   form unknown, et al.,         )
                                   )
 9              Defendants.        )
     _____)
10
11
12
13
14
15        Deposition of STEVEN BENHAYON, taken on
16   behalf of Defendants, at 633 West Fifth Street,
17   53rd Floor, Los Angeles, California, commencing at
18   10:14 a.m. Thursday, June 25, 2009, before BETH
19   FELIX, Certified Shorthand Reporter No. 12766.
20
21
22
23
24
25
```

103

1  Q  Okay. Mr. Benhayon, are you aware of any
2  reason why you won't be able to give your best, most
3  accurate and most truthful testimony for the remainder
4  of today?
5  A  No.
6  Q  Okay. And you promise to let me know if at
7  any point you feel that you need a break?
8  A  Yes.
9  Q  And you promise to let me know if at any point
10 you feel like you are unable to give your best, most
11 accurate and most truthful testimony?
12 A  Yes.
13 Q  You understand you're still under oath?
14 A  Yes.
15 Q  Okay. When did you first learn that RBC was
16 terminating your employment?
17 A  The morning they terminated us.
18 Q  Which would be September 17th; correct?
19 A  Correct.
20 Q  How did you find out?
21 A  I was called by Argyle Burke and another woman
22 in Minneapolis I believe.
23 Q  Do you remember her name?
24 A  No.
25 Q  Tracy McDonald?

106

1  there was -- you had only this one conversation with
2  Argyle and the other contact person; correct?
3      A   Correct.
4      Q   And subsequent to September 17th, did anybody
5  at RBC ever give you any additional information about
6  the reason you were being terminated?
7      A   No.
8      Q   Are you aware that other employees in the
9  fixed-income group were terminated at the same time?
10     A   Yep.  Yes.
11     Q   Are you aware of how many?
12     A   Approximately but I don't remember the number.
13     Q   Can you give me a complete list of all those
14 who were terminated on September 17th?
15     A   No.
16     Q   Are you aware that all of the employees in the
17 fixed-income group in the San Francisco office were
18 terminated on that day?
19     A   Yes.
20     Q   Did anyone tell you the effective date of your
21 termination?
22     A   September 17th.
23     Q   Okay.  Prior to September 17th, did you think
24 that you were going to be terminated prior to your
25 vesting date on January 1st, 2008?

1  are three Roman numerals.
2      A   Sure.  All right.
3      Q   Roman Numeral 1 reads, quote, On September 17,
4  2007, I was laid off.  On November 1st, 1990, I was
5  hired.  At the time of the layoff, I worked as a
6  managing director, and I was earning $365,000 per year,
7  end quote.
8      Was your job title managing director?
9      A   As far as I knew at the time, it was.
10     Q   Were there any other managing directors
11 associated with the San Francisco office?
12     A   I'm not sure of that.  I can only guess that a
13 few of the senior guys had gotten that title.
14     Q   Is that the highest title that is available to
15 a salesperson?
16         MS. MYRON:  Lacks foundation.  Calls for
17 speculation.
18         THE WITNESS:  It's, actually, true.  I
19 don't -- you know, I don't know.  You can call it
20 whatever you want, a senior VP, a senior salespeople.
21 You know, I think that's firm based.  I don't think
22 there's an industry standard of exactly what you are
23 called for who you are.
24 BY MR. DECKER:
25     Q   Well, I meant within RBC.

```
 1   here -- this $330,000 or limiting it to the amount that
 2   was going to vest on January 1st, 2008, those
 3   represented company contributions; right?
 4        A    Correct.
 5        Q    Right.  And they would be governed by this
 6   provision; correct?
 7             MS. MYRON:  Calls for a legal analysis and
 8   conclusion.  I'm going to instruct him not to answer
 9   that.
10             (Instruction not to answer.)
11             MR. DECKER:  That's not a basis not to answer
12   for crying out loud.  Can you withdraw the instruction?
13             MS. MYRON:  No.  Give him a better question.
14   He's never seen the document before today.
15             THE WITNESS:  I don't know.  I've never seen
16   it.
17   BY MR. DECKER:
18        Q    Okay.  All right.  Well, then take a look at
19   section 4.2.  I'd like you to read 4.2, and then after
20   you're done reading 4.2, let me know that you're ready
21   to answer questions.  You ready?
22        A    Yes.
23        Q    Okay.  You -- obviously, you're not dead;
24   right?  So you didn't leave RBC because of death;
25   correct?
```

1    A    Correct.
2    Q    And you didn't leave RBC because of
3  disability; correct?
4    A    Correct.
5    Q    Okay. And upon your separation, you didn't
6  enter into a business transition agreement with the
7  private client group; correct?
8    A    Correct.
9    Q    And you didn't meet the requirements under the
10 plan that are described here in little 2; right?
11        MS. MYRON:  Little 2 doesn't identify what a
12 plan for retirement is.
13 BY MR. DECKER:
14   Q    Well, if we look at little 2, right, it says
15 that -- it refers to the separation of a participant
16 who prior to separation with the consent of the
17 participating employer has, one, entered into a
18 business transaction --
19        MS. MYRON:  Slow down.
20        MR. DECKER:  I'm sorry.
21        MS. MYRON:  Why don't you just ask him if he's
22 retired.  That might help you.
23        MR. SCHNELL:  Yes.
24 BY MR. DECKER:
25   Q    Okay.  Have you retired?

192

| | |
|---|---|
| 1 | A    No. |
| 2 | Q    Okay.  And did you leave on account of |
| 3 | retirement? |
| 4 | A    No. |
| 5 | Q    All right.  And you're not aware of any other |
| 6 | exception to the rule in 4.5 that would apply to you; |
| 7 | right? |
| 8 | A    No.  I've never seen this before. |
| 9 | Q    Okay.  Let's go to -- what was it?  24? |
| 10 | MS. MYRON:  No, 25 you said. |
| 11 | MR. DECKER:  I know.  I'm sorry.  I realized I |
| 12 | wanted to have you look at 24 just so we can have the |
| 13 | numbers in front of us and don't have to approximate. |
| 14 | Q    Okay.  So let's go back to page 2.  Let's go |
| 15 | to that table, market value by plan year.  At the very |
| 16 | top of the next page, there's a total; right? |
| 17 | MS. MYRON:  Oh, yes. |
| 18 | BY MR. DECKER: |
| 19 | Q    $334,220.03; right? |
| 20 | A    Correct. |
| 21 | Q    Okay.  Which is the total amount of unvested |
| 22 | money that you forfeited when you were terminated; |
| 23 | correct? |
| 24 | MS. MYRON:  Object as to the use of the term |
| 25 | "forfeited." |