**BOHM, MATSEN, KEGEL & AGUILERA, LLP**
Kari M. Myron (Bar No. 158592)
Matthew J. Salcedo (Bar No. 237866)
695 Town Center Drive, Ste. 700
Costa Mesa, California 92626
Telephone: (714) 384-6500
Facsimile: (714) 384-6501
kmyron@bmkalaw.com

Attorneys for Plaintiff STEVEN BENHAYON

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br>STEVEN BENHAYON, an Individual,<br><br>        Plaintiff,<br><br>        vs.<br><br>ROYAL BANK OF CANADA, a Canadian company, business form unknown; RBC WEALTH MANAGEMENT COMPANY, formerly RBC DAIN RAUSCHER, INC., business form unknown; THE ROYAL BANK OF CANADA US WEALTH ACCUMULATION PLAN, formerly known as RBC Dain Rauscher Wealth Accumulation Plan; and, DOES 1 through 20,<br><br>        Defendants. | Case No.: CV08-06090 FMC (AGRx)<br>Assigned to Hon. Florence-Marie Cooper [Courtroom 750 (Roybal)]<br><br>**PLAINTIFF'S OPENING BRIEF RE:**<br><br>**1) NON-APPLICABILITY OF ERISA'S TOP HAT EXEMPTION TO THE U.S. WEALTH ACCUMULATION PLAN; AND**<br><br>**2) DEFENDANTS' EXECUTION OF THE U.S. WEALTH ACCUMULATION PLAN IN BAD FAITH** |

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

Plaintiff STEVEN BENHAYON hereby submits his Opening Brief Re: 1) Non-Applicability of ERISA's Top Hat Exemption to the U.S. Wealth Accumulation Plan; and 2) Defendants' Execution of the U.S. Wealth Accumulation Plan in Bad Faith, as follows.

## *Table of Contents*

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.     INTRODUCTION..................................................................1

II.    STATEMENT OF FACTS..................................................5

III.   AT ALL TIMES RELEVANT, THE WAP WAS AN EMPLOYEE BENEFITS PLAN GOVERNED BY ERISA, AND, AS SUCH, IS SUBJECT TO ERISA'S REQUIREMENTS ...................................11

IV.   THE WAP IS NOT A TOP HAT PLAN, WHICH WOULD EXEMPT IT FROM ERISA'S GOVERNANCE..................................12

A. THE WAP DID NOT COVER A "SELECT GROUP" OF EMPLOYEES SO AS TO QUALIFY AS A TOP HAT PLAN..............12

   1.  The Number Of WAP Participants Far Exceeds The Amount Of Employees Permissible To Constitute A "Select Group."......13

   2.  The WAP Participants -- Who Were All Fixed Income Sales Employees -- Did Not Have The Bargaining Power To Affect Or Substantially Influence The Terms And Conditions Of The WAP........15

B. THE WAP WAS NOT A COMPLETELY "UNFUNDED" PLAN AS REQUIRED UNDER 29 U.S.C. §§ 1051(2), 1081(a)(3), AND 1101(a)(1)..................................................................18

V.    RBC SET UP THE WAP IN BAD FAITH, AS PLAINTIFF IS BEHOLDEN TO THE ARBITRARY AND CAPRICIOUS DETERMINATIONS OF THE WAP COMMITTEE..........................21

A. THE WAP COMMITTEE WAS NOT SUBJECT TO PROPER CHECKS AND BALANCES SO AS TO PROTECT WAP BENEFICIARIES' INTERESTS...........................................21

B.  THE WAP IS COMPLETELY SILENT ON THE ISSUE OF TERMINATION WITHOUT CAUSE.....................................23

VI.   CONCLUSION..................................................................26

i

## *Table of Authorities*

### CASES

*Barrowclaugh v. Kidder, Peabody & Co.*, 752 F.2d 923 (3d Cir. 1985)...............3

*Belka v. Rowe Furniture Corp.,* 571 F. Supp. 1249 (D.C. Md. 1983)..........14, 18, 19

*Carrabba v. Randalls Food Markets, Inc.*, 38 F.Supp.2d 468

(N.D. Tex. 1999)........................................................................3, 15, 16, 17

*Crumley v. Stonhard, Inc.*, 920 F. Supp. 589 (D.C. N.J. 1996).....................19, 20

*Darden v. Nationwide Mut. Ins. Co.,* 796 F.2d 701 (4th Cir. 1986)

*aff'd,* 922 F.2d 203 (4th Cir. 1991), *rev'd on other grounds,*

503 U.S. 318 (1992) ...........................................................................13

*Demery v. Extebank*, 216 F.2d 283 (2d Cir. 2000) .........................................3

*Donovan v. Dillingham,* 688 F.2d 1367 (11th Cir. 1982)...........................11

*Duggan v. Hobbs*, 99 F.3d 307 (9th Cir. 1996) ..............................3, 13, 15

*In re New Valley Corporation,* 89 F.3d 143 (1996)................................2, 12

*Miller v. Eichleay Engineers, Inc.*, 886 F.2d 30 (3d Cir. 1989)....................2, 19, 22

*Pane v. RCA Corp.,* 868 F.2d 631 (3d Cir. 1989)....................................14

*Pannell Kerr Forster Int'l Ass'n v. Quek*, 5 Fed. Appx. 574, 577 (9th Cir. 2001).....25

*Satchwell v. Long John Silvers, Inc.*, 1992 U.S. App. LEXIS 9519 *8

(9th Cir. 1992...................................................................)...................25

*Starr v. MGM Mirage*, 2006 U.S. Dist LEXIS 80760 at *7-8 (D. NV 2006)..........12

### STATUTES

29 C.F.R. § 2520.104.20..........................................................................18

26 U.S.C. § 368(1)..................................................................................22

29 U.S.C. § 1001(a)................................................................................17

29 U.S.C. § 1051(2)..........................................................................2, 12, 18

29 U.S.C. § 1081(a)(3).......................................................................2, 12, 18

29 U.S.C. § 1101(a)(1).......................................................................2, 12, 18

ERISA § 201(2)......................................................................................12

ERISA § 301(a)(3) ................................................................................12

ERISA § 401(a)(1) ...............................................................................12

**OTHER**

House Rep. No. 533, 93d Cong., 2d Sess., *reprinted in*

1974 U.S.C.C.A.N. 4639, 4647.............................................................17

S. Rep. No. 127, 93d Cong., 2d Sess., *reprinted in*

1974 U.S.C.C.A.N. 4838, 4849.............................................................17

U.S. Department of Labor Opinion Letter 75-48 (December 23, 1975)............13, 14

U.S. Department of Labor Opinion Letter 75-64 (August 1, 1975) ................13, 14

U.S. Department of Labor Opinion Letter 90-14..........................................15

*http://www.bankofamerica.com/help/?statecheck=CA&template=faqs.cfm&lob=facts*

*#question6*.......................................................................................15

**TABLE OF CONTENTS/AUTHORITIES**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This is a wrongful termination action, wherein the ROYAL BANK OF CANADA and RBC WEALTH MANAGEMENT COMPANY, formerly RBC DAIN RAUSCHER, INC. (hereinafter collectively "the RBC Defendants" or "RBC"), terminated Plaintiff STEVEN BENHAYON from employment without cause 120 days before his pension benefits under RBC's US Wealth Accumulation Plan (hereinafter "the WAP") were due to vest.

Counsel for Defendants have recently stipulated that for purposes of this litigation, the WAP constituted an employee benefits plan governed by the Employee Retirement Income Security Act of 1974, as amended (29 U.S.C. §§ 1001-1381) (hereinafter "ERISA").

Given the fact that the WAP is an ERISA plan, Plaintiff hereby respectfully submits this brief so that this Court can determine the following bifurcated issues:

First, whether ERISA's "top hat" exemption applies to the WAP.

Second, whether the WAP was set up so as to specifically preclude benefit vesting and distributions to employees, like Plaintiff, who were terminated *without cause*. This is a critical issue inasmuch as the WAP is **completely silent** on the vesting and distribution of an employee's benefits when such an employee is terminated *without cause*. The WAP only addresses the following contingencies for vesting and distribution of benefits: death, disability, retirement, termination *for cause*, and termination due to restructuring.  Without specific language in the WAP addressing the vesting and distribution of WAP benefits where an employee is terminated *without cause* – just like Plaintiff – one cannot help but wonder whether RBC deliberately and purposefully kept silent on the issue so that when employees like Plaintiff were just months away from their vesting and distribution date, RBC could terminate such employees without having to pay their due benefits.  Plaintiff respectfully submits that this is exactly what happened in the instant case.

1

1

2    With regard to the top hat exemption, which RBC claims applies to the WAP,

3   the facts of this case alone should compel the conclusion that no such exemption

4   applied. Here, according to RBC's own discovery responses, approximately **One**

5   **Thousand Two Hundred (1,200)** of its U.S. employees participated in the WAP.

6   This vast number of participants defies the statutory law and case law which defines a

7   top hap plan as a plan maintained "primarily for the purpose of providing deferred

8   compensation for a **select group** of management or highly trained employees."[1]

9    In the seminal case, *In re New Valley Corporation*, the court held that top hat

10  plans are **extremely narrow** and "**must cover relatively few employees**."[2]  The *New*

11  *Valley* court further concluded that top hat plans are a "rare sub-species of ERISA

12  plans, and Congress created a special regime to cover them."[3]   The simple fact in this

13  case is that in relation to the number of RBC's management or highly trained

14  employees in the U.S., **One Thousand Two Hundred (1,200)** far exceeds any

15  purported **select group** of high-level employees.

16    Further, Plaintiff submits that the group of participants that the WAP covered

17  comprised mere sales employees – not executives or officers of RBC.  Despite being

18  well paid due to their productivity, these sales employees, like Plaintiff, had no

19  bargaining power whatsoever to substantially influence and negotiate the terms of the

20  WAP so as to ensure that the WAP protected their pension interests.  Plaintiff was

21  neither allowed nor in a position to negotiate the particular terms and conditions of

22  the WAP. His "invitation" to participate in the WAP was purely on a "take-it-or-

23  leave-it" basis.  Indeed, the sales employees were simply handed the summary of the

24

25  _____

26  [1] 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1); *In re New Valley Corporation*, 89
    F.3d 143, 148 (1996); *Miller v. Eichleay Engineers, Inc.*, 886 F.2d 30, 34 n. 8 (3rd Cir.

27  1989) (Emphasis added.)
    [2] 89 F.3d 143, 148 (3rd Cir. 1996) (Emphasis added.)

28  [3] *Id.*

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

1  plan provisions and encouraged to enroll so as to receive lucrative matching employer

2  contributions and a performance bonus.  Pursuant to prevailing case law that will be

3  discussed below, such lack of bargaining power over the terms and conditions of the

4  plan compels the conclusion that such a group of employees was not sufficiently

5  "select" to be considered a "select group" for purposes of the top hat exemption.[4]

6  Why is the top hat distinction so important even though Defendants stipulate

7  that WAP was an ERISA plan?  The answer is that ERISA plans that are not top-hat

8  exempted are subject to a stringent set of statutory rules and attendant fiduciary duties

9  under ERISA.  Top hat plans, on the other hand, are not governed by the same set of

10  stringent rules.  Rather, because Congress has determined that they are such a "rare

11  sub-species of ERISA plans," they are governed by the federal common law of

12  contract – and nothing more.[5]  Given the plethora of U.S. RBC employees that

13  participated in the WAP along with Plaintiff, Plaintiff submits that the Participating

14  Employee pool was not a "select group" as required to qualify the WAP as a top hat

15  plan and remove it from the strictures of ERISA law.

16  Last, it is undisputed that RBC terminated Plaintiff without cause.  However, a

17  review of the WAP reveals that RBC has interestingly omitted any provisions

18  regarding Participating Employees who are not terminated for cause, but, like

19  Plaintiff, are arbitrarily terminated without cause.  This issue is significant in that

20  upon Plaintiff's invitation to participate in the WAP in 2003, the WAP expressly

21  provided that Participating Employees who separated from the RBC before the four-

22  year distribution date of January 1, 2008, were able to receive WAP distributions.  In

23  fact, the 2003 WAP provided that if a Participating Employee was no longer with

24

25  [4] *See Carrabba v. Randalls Food Markets, Inc.*, 38 F.Supp.2d 468 (N.D. Tex. 1999);
26  *Duggan v. Hobbs*, 99 F.3d 307 (9th Cir. 1996); *Demery v. Extebank*, 216 F.2d 283 (2d Cir. 2000).
27  [5] *Id.* at 149 *citing Barrowclaugh v. Kidder, Peabody & Co.*, 752 F.2d 923, 926 (3rd Cir. 1985) (*Barrowclaugh* remains good law for all points cited in the *New Valley*
28  opinion, although certain points have been subsequently overturned.)

3

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

RBC at the date of the scheduled distribution (January 1, 2008) he or she could arrange to receive his or her WAP distributions in two annual installments.[6] Furthermore, the 2007 WAP provides that: "If Separation occurs prior to the otherwise schedule In-Service Payment Date [here, January 1, 2008], then ... the Account Balance shall be distributed due to Separation[.]"[7]   The 2007 WAP also provides that: "If the participant did not indicate a distribution date on his or her Election Forms ... then distribution of the Account Balance will be made as soon as practicable after July 1 following the date of vesting."[8]

Despite the foregoing, when Plaintiff requested his due distributions after separating from RBC, RBC refused to honor his request. RBC wholly ignored the provisions regarding distributions upon separation as provided in the 2003 WAP. Interestingly, RBC ignored the distribution provisions of the 2003 WAP because 2003 was the year the four-year vesting period was promised to begin.   RBC's employer contributions were due to vest on January 1, 2008 – **just 120 days before Plaintiff's separation**.   In reviewing the vesting language under the 2007 WAP, it provides for: 1) Vesting of Voluntary Deferred Compensation; 2) Vesting of Mandatory Deferred Compensation and Company Distributions; 3) Termination for Cause; 4) Terminations due to Restructuring; and 5) Forfeitures.[9]

While the foregoing clauses address RBC's policies regarding the vesting and distributions of WAP benefits upon separation of a Participating Employee by reason of retirement and termination *for cause*, there is absolutely no language that addresses

---

[6] All references shall be to the Administrative Record.  "AA" shall denote those portions of the Administrative Record which Defense Counsel provided to Plaintiff's Counsel, and "SAA" shall denote those supplemental portions of the Administrative Record subject to "Plaintiff's Supplement to the Administrative Record," filed concurrently herewith.  *See* SAA 062.

[7] *See* AA 021.

[8] *See id.*

[9] *See* SAA 062.

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

the separation of a Participating Employee when the company simply terminates said employee *without* cause – as in the instant case. The absence of such language creates an extremely favorable loophole for Defendants: RBC, through its WAP Committee (which has full decision-making discretion relative to the WAP and is comprised of human resource persons who also have the responsibility of hiring and firing RBC employees), can totally circumvent paying benefits by terminating an employee prior to the vesting date, thus precluding the employee from being employed as of the date of the vesting, so as to reap the long-awaited benefits earned four years prior.  As this Court understands – and as Defendants, a group of sophisticated international companies, understand – an employee can leave a company or be terminated for myriad reasons not relating to death, disability, retirement, or cause.

It is wholly untenable that RBC's failure to address the issue of vesting of benefits in a situation where one of its employees was terminated without cause was merely an oversight.  Rather, Plaintiff submits that RBC deliberately and in bad faith chose not to address the "terminated without cause" issue so that, just as in this case, RBC could avoid paying Plaintiff the benefits to which he was entitled.  Due to RBC's bad faith decision not to address the "terminated without cause" issue, Plaintiff was effectively used as a pawn in RBC's game to squeeze the most productivity it could out of him, and in complete violation of public policy and decency, "robbed" Plaintiff of his deserved compensation that was due to vest and be distributed 120 days from his date of termination.

## II.   STATEMENT OF FACTS

Before he was terminated without cause on September 17, 2007, Plaintiff was the Managing Director of Institutional Sales/Fixed Income Sales U.S., for Defendant RBC's Capital Markets division in San Francisco.

Since his hiring date of November 1, 1990, Plaintiff was a valued long-term employee with RBC (and its predecessor, Sutro Partners). During his career with RBC, which spanned approximately approximate 17 years, Plaintiff was a leading

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

employee and a recipient of several awards for his productivity and sales figures. Indeed, for *at least* the five years leading up to his September 17, 2007 termination, at a point when the financial markets were extremely volatile, Plaintiff was consistently in the top 10 percent for sales throughout RBC's Fixed Income Sales Unit.  Plaintiff was a yearly recipient of RBC's esteemed "Pinnacle Award," which is based solely on an employee's productivity.  In each of Plaintiff's performance evaluations dated October 26, 2006, and June 30, 2006, Plaintiff was rated as "High Performing/Outstanding" and "Outstanding," respectively.  Plaintiff was exactly the type of exemplary and talented employee that RBC wished to keep in order to grow its business and propel its reputation in the U.S. financial markets.

In 2003, recognizing Plaintiff's talent and stellar productivity, Defendant RBC invited Plaintiff to participate in the WAP. RBC designed the WAP "for those employees who contribute greatly to the success of the firm" and as a means of providing financial benefits to Plaintiff so as to incentivize him to stay with RBC. (*See* AA 049.)

Pursuant the 2003 Plan Summary, Plaintiff was eligible to make voluntary deferrals to the WAP of up to 10 percent of his yearly compensation over $100,000, which RBC would then match. (*See* AA 049.)  Plaintiff also had the option of making a voluntary deferral to the WAP of up to 20 percent of his yearly compensation over $100,000.  Further, Plaintiff had the opportunity to participate in the WAP Production Bonus and Company Variable Match programs, which would yield yet additional layers of attractive financial benefits for Plaintiff, to encourage him to be even more productive than he already was.

An attractive "selling point" of the WAP was that it expressly provided that all WAP Production Bonuses and matching contributions made by RBC were subject to four-year vesting.  (*See* AA 049.)  Thus, based on Plaintiff's 2003 productivity, and provided that Plaintiff agreed to defer 20 percent of his compensation, Plaintiff was eligible for both employer matchings (as to the first 10 percent) and a WAP

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

1   Production Bonus.  These company matchings and the WAP Production Bonus that
2   Plaintiff earned for 2003 were due to vest on January 1, 2008. (*See* AA 049.)  Indeed,
3   the 2003 Plan Summary that RBC provided to Plaintiff stated that the vesting periods
4   for the deferrals were as follows:

5   - Voluntary Deferrals: Immediate vesting;
6   - WAP Production Bonus: Four years after bonus is credited (1/1/2008);
7     and
8   - Company Variable Match:  Four years after bonus is credited (1/1/2008).
9   (*See* AA 049.)

10      Throughout the annual WAPs, all of Plaintiff's Company Variable Matchings
11  and WAP Production Bonus were expressly due to vest in four years.  Plaintiff and all
12  other participating employees had to wait four years to receive their due distributions.
13  Given the four-year waiting periods, it was as if RBC was constantly dangling a
14  carrot in front of Plaintiff's nose to keep him on board as long as possible – that is, as
15  long as RBC was willing to keep him before they decided to terminate him without
16  cause.

17      As for employees who "separated" from RBC prior to the scheduled
18  distribution date, the WAP allowed such "separated" employees to receive
19  distributions as well. RBC defined the term "Separation" as "the date of a Plan
20  Participant's separation of employment from the Company." (*See* SAA 059.) With
21  respect to employees who "separated" from RBC prior to the scheduled distribution
22  date, the WAP provided as follows:

23      "**Distributions**. Upon electing to participate in the Plan, a
24      participant will make an irrevocable election with respect to the
        timing of the payment of the amounts credited to such
25      participant's accounts.  A participant may elect to have such
26      distribution made either (i) upon the earlier of a specified date
        (which date must fall on the last day of a calendar quarter;
27      provided that, any distribution shall be made prior to the last
        day of a calendar quarter if such distribution would result in
28

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

payments to a participant in more than one calendar year) **or the date of his … Separation if prior to such specified date, or (ii) upon such Separation.**

[I]f the employee is no longer with RBC at the date of the scheduled distribution, such distribution shall be in two annual installments if the election is triggered by the participant's Separation prior to the date certain.

Upon Separation, the first installment shall be equal to 50% of all amounts deemed allocated to a participant's accounts on the first payment date, and the second installment shall be equal to the remainder of all amounts deemed allocated to such participant's accounts on the second payment date[.]"

(*See* SAA 062.) (Emphasis added.)

Plaintiff was encouraged by the WAP as an attractive vehicle to make his money work best for him, while he continued to work his best for RBC. Given the attractive nature of the WAP, Plaintiff accepted his invitation to the WAP in 2003. As Plaintiff was a huge earner for RBC, and given that he had two performance evaluations in mid- and late-2006 that rated him as "Outstanding" and "High Performing/Outstanding," respectively, he justifiably believed that he would, at the very least, maintain his employment with RBC until January of 2008. Simply put, there was no indication from RBC at any time that Plaintiff was in jeopardy of being fired without cause.

However, out of nowhere, on September 17, 2007, Plaintiff received notice of his termination from RBC. (*See* **Exhibit "A"** attached to the Declaration of Kari M. Myron, and incorporated herein by this reference.) While the termination itself was a tremendous shock to Plaintiff, who had been doing so well for RBC, the timing of the termination was even more shocking. Plaintiff's termination fell on a day when he was **120 days away from his four-year WAP vesting date**. Plaintiff submits that the timing of his termination was not fortuitous. Plaintiff further submits that the label of his termination "due to restructuring" was, like its timing, not a matter of coincidence, but rather, part of a scheme by RBC fueled by greed to squeeze as much

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

productivity out of Plaintiff, and as much cash out of him, which RBC intended to forfeit from day one.

Plaintiff's termination was not "for cause" as set forth in the WAP.  Indeed, relative to termination "for cause," the WAP expressly provides in pertinent part:

> "**4.3    Termination For Cause.**  Notwithstanding anything to the contrary in this Section 4, if a participant ceases to be employed by the Company … at any time prior to the distribution of the investments described herein due to his or her gross or willful misconduct during the scope of his or her employment, including theft or commission of a gross misdemeanor or felony, upon such participant's termination all of his or her Mandatory Deferred Compensation and Company Contributions will be forfeited, regardless of whether the vesting schedule has otherwise been satisfied … and the proceeds thereof will be deemed returned to the Company."

(*See* AA 020.)

Here, Plaintiff's termination from RBC was not due to any gross or willful misconduct on his part during the scope of his employment with RBC.  In fact, Defendants do not claim or make any assertions that Plaintiff's separation from RBC was due to theft or commission of a gross misdemeanor or felony.  Rather, it is undisputed that Plaintiff's termination was part of an "arbitrary" termination by RBC, which, per RBC, ranges in scope from "position elimination" to "reduction in force" to "reorganization in the face of challenging credit markets." As Plaintiff's termination from RBC was not "for cause" (using the WAP definition), he is not and was never subject to forfeiture of his deferred compensation, WAP Production Bonus, and Company Contributions under the WAP.

On November 9, 2007, Plaintiff submitted written claims to the Human Resources Department of RBC Capital Markets Corporation, in New York, as well as the Human Resources Department of RBC Dain Rauscher, Inc., in Minneapolis, demanding distribution of his benefits.  Plaintiff informed both Departments that his separation from RBC was neither voluntary nor for cause, and that he was entitled to

1     an immediate distribution of his benefits under the WAP. (*See* AA 076-081.)

2        On November 12, 2007, Plaintiff requested a review of Plaintiff's WAP

3 account by the WAP Committee, and further requested accelerated vesting of all

4 employer contributions, in accordance with the terms of the WAP. (*See* AA 74-75.)

5        On November 15, 2007, shortly after Plaintiff's claims on RBC for vesting

6 and distribution of his deferred compensation and Company Contributions, RBC's

7 Senior Associate General Counsel, Todd W. Schnell, informed Plaintiff that "the

8 terms of the Wealth Accumulation Plan do not provide for the accelerated vesting of

9 employer contributions that you seek." (*See* AA 72-73.)

10        On December 11, 2007, Mr. Schnell informed Plaintiff that his unvested

11 portion of the employer contributions to his WAP had been forfeited. (*See* AA 71.)

12        On February 6, 2008, Plaintiff requested a reconsideration of the Committee's

13 denial of accelerated vesting and distribution. (*See* AA 65-70.)

14        Despite Plaintiff's efforts, Mr. Schnell informed Plaintiff on April 9, 2008, that

15 the Committee had once again decided not to approve Plaintiff's request for

16 accelerated vesting and distribution. (*See* AA 64.)

17        It must be noted that in each of Mr. Schnell's letters to Plaintiff's counsel, he

18 represented that **the Committee** had reviewed Plaintiff's claim, and that **the**

19 **Committee** had determined that Plaintiff was not entitled to accelerated vesting and

20 distribution. Most interestingly, however, the only minutes of the Committee

21 regarding Plaintiff's termination are dated April 7, 2008 – *5 months after* Plaintiff's

22 initial claims to Defendants. (*See* AA 301.) This begs the question: If the only

23 Committee minutes regarding Plaintiff's claim were entered on April 7, 2008, how is

24 it possible that the Committee convened and reviewed Plaintiff's claim on November

25 15, 2007 and December 11, 2007, as represented in Mr. Schnell's letters to Plaintiff's

26 counsel? Either the Committee convened regarding Plaintiff's termination and did

27 not enter minutes on the record, which is unlawful, or the Committee did not meet on

28 November 15, 2007 and December 11, 2007, as Mr. Schnell represented, and Mr.

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

1  Schnell took it upon himself as Senior Associate General Counsel to review and reject
2  Plaintiff's claims himself.  Pursuant to the 2007 WAP, "All decisions on claims and
3  reviews of denied claims will be made by the Committee."  If, indeed, Mr. Schnell
4  made the decisions as to Plaintiff's claims, that presents a major violation of the
5  WAP.

6       After exhausting all of his administrative remedies, Plaintiff was forced to file
7  the instant suit against Defendants. Defendants have answered, and assert as an
8  affirmative defense that the WAP is exempt from ERISA's stringent laws as a "top
9  hat" plan.

10 **III.  AT ALL TIMES RELEVANT, THE WAP WAS AN EMPLOYEE**
11 **BENEFITS PLAN GOVERNED BY ERISA, AND, AS SUCH, IS**
12 **SUBJECT TO ERISA'S REQUIREMENTS**

13      In determining whether an employee benefits plan is an ERISA plan, the
14 circuits have all adopted the test laid out in *Donovan v. Dillingham,* 688 F.2d 1367
15 (11th Cir. 1982).  Pursuant to the *Dillingham* test, a plan is an ERISA plan if it is: "1)
16 a plan, fund, or program, 2) established or maintained, 3) by an employer, by an
17 employee organization, or both, 4) for the purpose of providing retirement benefits or
18 deferred income for periods extending beyond the termination of employment, 5) to
19 employees. *Id.* at 1373.

20      On January 13, 2009, Defendants raised as their Twentieth Affirmative
21 Defense that Plaintiff's claims are barred, in whole or in part, because the Plan is not
22 subject to the provisions of ERISA.

23      In response, on or about March 17, 2009, Plaintiff propounded discovery to
24 Defendants seeking "all facts" in support of their Twentieth Affirmative Defense.  In
25 response to Plaintiff's discovery, Defendants stated that for purposes of this litigation,
26 they: "[W]ill not oppose Plaintiff's contention that the Plan is an 'employee benefit
27 plan' regulated and governed by the ERISA."
28 ///

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

## IV.   THE WAP IS NOT A TOP HAT PLAN, WHICH WOULD  EXEMPT IT FROM ERISA'S GOVERNANCE

Defendants claim that even if the WAP is an ERISA plan, it is nonetheless exempt from ERISA's rules and regulations as a "top hat" plan.  Notwithstanding Defendants' contentions, the WAP fails as a top hat plan, among other things, because it did not cover a "select group" of employees, and was not an "unfunded" plan, as required by law.

A "top hat" plan is an employee benefit plan "that is **unfunded** and is maintained by an employer primarily for the purpose of providing deferred compensation for a **select group** of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1) (ERISA § 201(2), § 301(a)(3), § 401(a)(1)) (Emphasis added.)  Top hat plans are subject to the exclusive jurisdiction of ERISA [ERISA §§ 201(2), 301(a)(3)], but, as will be discussed extensively below, are exempt from ERISA's vesting, funding and fiduciary requirements (and thus individual fiduciary liability). ERISA § 401(a)(1), 29 U.S.C. § 1101(a)(1).  *In re New Valley Corp.*, 89 F.3d 143, 146 (3rd Cir. 1996); *Starr v. MGM Mirage*, 2006 U.S. Dist LEXIS 80760 at *7-8 (D. NV 2006).

### A. THE WAP DID NOT COVER A "SELECT GROUP" OF EMPLOYEES SO AS TO QUALIFY AS A TOP HAT PLAN.

In analyzing the "select group" of employees issue, the court in *In re New Valley Corp.*, stated: "This final limitation has both quantitative and qualitative restrictions. In number, the plan must cover relatively few employees. In character, the plan must cover only high level employees. Because of these limitations, top hat plans form a rare sub-species of ERISA plans, and Congress created a special regime to cover them." *In re New Valley Corp., supra,* 89 F.3d at 148.

///

///

///

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

**1. The Number Of WAP Participants Far Exceeds The Amount Of Employees Permissible To Constitute A "Select Group."**

In *Duggan v. Hobbs*, 99 F.3d 307 (9th Cir. 1996), the Ninth Circuit dealt with the issue of what a "select group" means in order for a plan to qualify as a top hat plan. There, the plaintiff brought suit against his former employer for violations of ERISA, after the employer terminated the plaintiff's benefits under the employer's ERISA severance plan. *Id.* The *Duggan* court reasoned that **employees are part of a "select group" where the employer's plan coverage "is limited to a small percentage of the employer's entire work force**." *Id.* at 312. (Emphasis added.) The plaintiff in *Duggan* was the only employee out of 23 employees who was invited to participate in the subject plan, constituting less than 5 percent of the subject work force. *Id.* Numerically, the court held that the plaintiff qualified as a "select group" of employees. *Id.*

In arriving at its decision, the Ninth Circuit in *Duggan* looked to other courts' handling of the "select group" issue. The *Duggan* court cited *Darden v. Nationwide Mut. Ins. Co.,* 796 F.2d 701 (4th Cir. 1986) *aff'd,* 922 F.2d 203 (4th Cir. 1991), *rev'd on other grounds,* 503 U.S. 318 (1992). In *Darden*, the Fourth Circuit dealt with a former insurance agent who sued his employer to recover retirement benefits under an ERISA benefits plan. *Id.* There, the plaintiff contended that the average number of plan participants for years 1976, 1977, 1978, 1979, and 1980, was 5,315 out of a total work force of 20,544, or 25.9 percent. *Id.* at 396. Defendant Nationwide, on the other hand, argued that the average number of insurance agents for the relevant time period was 3,272 agents out of a work force of 20,845, or 15.7 percent. *Id.* The court found 18.7 percent of Nationwide's work force had participated in the plan. *Id.* at 397.

With this relevant "group" of 18.7 percent, the *Darden* court went on to determine whether the group was "select." *Id.* The court considered two opinion letters from the Department of Labor holding that ERISA plans covering fewer than 4 percent and 0.2 percent of employees were limited to select groups. *Id.* citing U.S.

1  Department of Labor Opinion Letters 75-64 (August 1, 1975) and 75-48 (December
2  23, 1975).  The court held: "Although these decisions do not demarcate the upper
3  range of 'select groups,' **the court finds that the group in question here,**
4  **comprising almost one-fifth of the Nationwide work force, is too large to be**
5  **considered "select" for purposes of the top-hat exemption**." *Id.* (Emphasis added.)

6      In contrast, courts have been more apt to find a "select group" where the
7  percentage of the work force that participates in the ERISA benefits plan is relatively
8  low.  For instance, in *Pane v. RCA Corp.,* 868 F.2d 631 (3d Cir. 1989), the Third
9  Circuit found that a top hat plan existed where the "select group" covered a group of
10  61 management employees out of a work force of 80,000 persons. *Id.* at 637.  This
11  number averaged **less than one-tenth of one percent of the work force.** *Id.*
12  (Emphasis added.)

13      Likewise in *Belka v. Rowe Furniture Corp.,* 571 F. Supp. 1249 (D.C. Md.
14  1983), the court dealt with commissioned salespersons who were invited to
15  participate in pension agreements. *Id.* at 1250.  According to information supplied by
16  the employer and not disputed by the plaintiff, between **1.6 percent of the**
17  **defendant's work force** in 1972 and **4.6 percent of the work force** in 1980 were
18  covered by the agreements. *Id.* at 1252. There, the court found that a top hat plan
19  existed where the "select group" of participants was, among other factors, low
20  compared to the defendant's entire work force. *Id.* at 1252-53.

21      In the instant case, on March 21, 2001, RBC filed information with the
22  Department of Labor indicating that **One Thousand Two Hundred (1,200)** of its
23  U.S. employees were participants in the WAP. (*See* AA 09.)  Assuming, *arguendo*,
24  that 1,200 employees constitutes a mere **1 percent** of RBC's work force in the U.S.,
25  we would be looking at a work force of **120,000** employees in the U.S. alone.  Bank
26  of America, one of the nation's largest banks, currently employs 132,749 full-time
27
28

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

1 | associates in the U.S.[10]  It strains credulity to assert that the 1,200 U.S. employees
2 | who participated in the WAP were, quantitatively, a "select group" of RBC
3 | employees who participated in the WAP.

**2. The WAP Participants – Who Were All Fixed Income Sales Employees[11] – Did Not Have The Bargaining Power To Affect Or Substantially Influence The Terms And Conditions Of The WAP.**

In *Duggan v. Hobbs*, the Ninth Circuit considered an Opinion Letter issued by the Department of Labor's, providing in pertinent part:

> "[T]he top-hat exception was intended to apply to employees who 'by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan[.]'"

*Duggan, supra,* 99 F.3d at 310 citing DOL Opin. Letter 90-14A.

There, the court found that the plaintiff – the only person making up the "select group" – was able to exert substantial influence over the design and operation of his severance agreement through his attorney and his negotiations with the ERISA plan's administrator. *Id.* at 312-13. Accordingly, the court concluded that the plaintiff's severance agreement was maintained for a "select group" within the meaning of section 1101(a)(1). *Id.*

In the seminal case of *Carrabba v. Randalls Food Markets, Inc.*, 38 F.Supp.2d 468 (N.D. Tex. 1999), the court relied heavily on the Ninth Circuit's reasoning in *Duggan*, and stated that the significant inquiry is whether each of the members of the "select group" of a subject ERISA plan has the bargaining power to substantially influence the benefits, terms, and operation of the plan. *Id.* at 476; *Duggan, supra,* 99 F.3d at 312-13.

///

---

[10]*http://www.bankofamerica.com/help/?statecheck=CA&template=faqs.cfm&lob=facts#question6.*
[11]*See* SAA 048, 052, 056, and 060.

Similar to Plaintiff's case, in *Carrabba*, the plan was offered to "a limited group of management employees who contribute materially to the continued growth, development, and future business success of [the employer] and its subsidiaries." *Id.* at 471. The plan was administered and managed by a committee of members who took recommendations from the personnel office. *Id.* In the matter at hand, the Committee was made up of Human Resources employees. (*See* AA 0025.) Thus, the committee in *Carrabba* and the Committee in the instant case were driven by the authority of the respective companies' Human Resource employees. The plan participants in *Carrabba* included an array of employees: division and department managers, store directors and assistant store directors, warehouse managers, and operations managers, among others. *Carrabba, supra,* 38 F.Supp.2d at 474. In a nutshell, the employer "considered everyone who had any level of management to be a key employee of the company." *Id.* The goal was to make participation in the [pension plan] available to all of those key employees. *Id.*

Notwithstanding the employer's labeling of the plan participants as "key employees," the *Carrabba* court determined that there was no evidence "that the participants in the [pension plan] were able to influence the terms of [the pension plan], or tried to exercise any such influence" and that the participants did not have "the bargaining power to influence the benefits or other terms of the [pension plan] in any respect." *Id.* at 476. The court held that the pension plan did not qualify as a top hat plan because "**the mere fact that the employer intends the plan to be a reward to 'key' employees does not satisfy the degree of selectivity contemplated by the statutes.**" *Id.* at 477. In sum, the *Carrabba* court stated that the appropriate test for determining whether a "select group" is sufficiently select is:

> "Whether the members of the group have positions with the employer of such influence that they can protect their retirement and deferred compensation expectations by direct negotiations with the employer."

*Id.* at 478.

1    The *Carrabba* test echoes the sentiment of Congress. One of Congress' chief
2    concerns in drafting ERISA was "to restore credibility and faith in the private pension
3    plans designed for American working men and women." H.R. Rep. No. 533, 93d
4    Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 4639, 4647 ("House Report"); S.
5    Rep. No. 127, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 4838, 4849; *see*
6    *also id.* at 4838 (discussing Senate bill's response "to the issue of whether American
7    working men and women shall receive private pension plan benefits which they have
8    been led to believe would be theirs upon retirement"); House Report at 4643 (noting
9    "concern for loss of benefits by workers after long years of labor through
10   circumstances beyond their control"). "[M]any employees with long years of
11   employment are losing anticipated retirement benefits," that employee benefit plans
12   "have become an important factor affecting the stability of employment and the
13   successful development of industrial relations," and that statutory protection
14   is necessary to "assure the equitable character of such plans and their financial
15   soundness." 29 U.S.C. § 1001(a). "**Implicit in this congressional statement of**
16   **purpose is the recognition that the persons to be aided by the statute lacked**
17   **sufficient economic bargaining power to obtain contractual rights to non-**
18   **forfeitable benefits**." 29 U.S.C. § 1001(a) (Emphasis added.)
19   Applying the *Carrabba* test to the instant case, the Court should arrive at the
20   same conclusion. Here, as in *Carrabba*, RBC sought to reward several of its "key"
21   sales employees with company contributions and productivity bonuses. Each and
22   every one of the WAP participants, including Plaintiff was not an executive of RBC;
23   rather, like the employees in *Carrabba*, the RBC U.S. sales force comprised the hard-
24   working nuts and bolts of the RBC system. There is no doubt that Plaintiff and his
25   fellow sales employees were "key" to RBC's operations in the U.S. However, the
26   controlling issue is not whether they were huge earners – or made RBC a lot of
27   money – rather, it is whether all 1,200 WAP participants of the Fixed Income Sales
28   Force had positions with RBC of such influence that they were able to protect their

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

1  retirement and deferred compensation expectations by direct negotiations with RBC.
2  The fact that Plaintiff is before this very Court trying his hardest to get the benefits he
3  is due under the WAP speaks volumes as to whether he was ever in a position with
4  RBC to substantially influence the WAP's terms and conditions and protect his
5  retirement expectations.

6       As such, the Court should find that Plaintiff was not a member of a "select
7  group" required to qualify the WAP as a top hat plan.

8      **B. THE WAP WAS NOT A COMPLETELY "UNFUNDED" PLAN AS**
9          **REQUIRED UNDER 29 U.S.C. §§ 1051(2), 1081(a)(3), AND 1101(a)(1).**

10      As stated, to qualify as a top hap plan, the employee benefit plan must be
11  "unfunded."  29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).  However, a review of
12  ERISA, its legislative history, and the rules and regulations promulgated by the
13  Department of Labor does not provide a bright line test for determining whether an
14  ERISA plan is "funded" or "unfunded."  *See Belka v. Rowe Furniture Corp.,* 571 F.
15  Supp. 1249, 1251 (D.C. Md. 1983).  Rather the answer lies in the case law. *See id.*

16      In *Miller v. Eichleay Engineers, Inc.*, 886 F.2d 30 (3d Cir. 1989) the court shed
17  some light on the "unfunded" definition, holding that an "unfunded" plan is one
18  where "**every** dollar provided in benefits is a dollar spent by … the employer." *Id.* at
19  33-34.  (Emphasis added.)

20      In *Belka,* the plaintiff was invited to participate in a deferred compensation
21  plan in which the employer secured insurance policies on the lives of the covered
22  employees.  *Belka, supra,* 571 F. Supp. at 1250.  The policies were held in the
23  employer's name and were considered to be a part of the employer's general assets.
24  *Id.* at 1250-51.  The court analyzed 29 C.F.R. § 2520.104.20, which exempts benefit
25  plans from reporting and disclosure requirements regarding benefits "provided
26  exclusively through insurance policies, the premiums for which are paid directly from
27  the employer's general assets." *Id.* at 1251 citing 29 C.F.R. § 2520.104.20.  Given
28  that the plan's benefits came from the employer's general assets, the court found that

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

1    the plan was "unfunded." *Id.*

2        In *Crumley v. Stonhard, Inc.*, 920 F. Supp. 589 (D.C. N.J. 1996), the court held

3 that an "unfunded" plan is defined as "a plan in which **only** the employer provides the

4 necessary funding for the benefits under the plan." *Id.* at 592-93. (Emphasis added.)

5 There, the plaintiff was invited to participate in an ERISA plan, in which all benefits

6 were contributed by the employer. *Id.* at 591. More specifically, the employees were

7 not required to make any monetary contributions to the plan. *Id.* at 590.

8 Approximately two years after enrolling in the plan, the plaintiff was terminated from

9 employment. *Id.* at 591. The defendant employer claimed that the plan was unfunded

10 and thus subject to top-hat exemption. *Id.* Upon review, the court determined that the

11 employer was the **sole** source of all benefits and payments under the plan, and that the

12 plaintiff employee did not make **any** contributions to the plan. *Id.* Based on the fact

13 that the employer was the **sole contributor** to the plan, the court held that the plan

14 was "unfunded." *Id.*

15        In the instant case, **Plaintiff** contributed huge amounts of layered Voluntary

16 Deferred Compensation into the WAP. Additionally, **Plaintiff** contributed huge

17 amounts of a separate layer of Mandatory Deferred Compensation. Each of these

18 contributions came directly from Plaintiff's pocket – not from RBC's general assets

19 or general ledger. Thus, that portion of the WAP contributed by Plaintiff was clearly

20 "funded" pursuant to *Belka* and *Crumley,* which hold in the negative that "unfunded"

21 means "paid directly from the employer's general assets." *See Belka, supra,* 571 F.

22 Supp. at 1251; *Crumley, supra,* 920 F. Supp. at 591. As the WAP clearly comprises

23 Plaintiff's own contributions, RBC cannot claim that the WAP was completely

24 "unfunded" and thus top-hat exempted. *See Miller, supra,* 886 F.2d at 33-34 (an

25 "unfunded" plan is one where "**every** dollar provided in benefits is a dollar spent by

26 the employer"); *Crumley, supra,* 920 F. Supp. 592-93 (an "unfunded" plan is "a plan

27 in which **only** the employer provides the necessary funding for the benefits under the

28 plan").

---

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

Unlike the pension plan in *Crumley*, the instant case presents a scenario where RBC's Participating Employees, including Plaintiff, were required to defer their own compensation to the WAP.  Further unlike the pension plan in *Crumley*, all benefits received pursuant to the WAP did not **solely** come from RBC's general assets. Indeed, throughout the 2003 Plan Summary, the WAP expressly states that "components" of the WAP were the participants' own **eligible compensation – NOT general assets of RBC**. To be sure, the 2003 Plan Summary provides:

### 2003 WAP Production Bonus Grid

| 2003 Eligible Compensation from Commission Grids | WAP Production Bonus (% of 2003 Eligible Compensation) |
|---|---|
| Below $300,000 | 0% |
| $300,000 to $399,999 | 5% |
| $400,000 to $499,999 | 7.5% |
| $500,000 or more | 10% |

### 2003 WAP Variable Match Grid

| RBC Net Income After Tax | | Variable Match % |
|---|---|---|
| FROM | TO | |
| Below $25.0 mm | | 0% |
| $25.0 mm | $39.9 mm | 15% |
| $40.0 mm | $54.9 mm | 20% |
| $55.0 mm | $64.9 mm | 25% |
| $65.0 mm | $74.9 mm | 30% |
| $75.0 mm | $84.9 mm | 35% |
| $85.0 mm | $94.9 mm | 40% |
| $95.0 mm | $104.9 mm | 45% |
| Above $105.0 mm | | 50% |

(*See* AA 051.)

///

///

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

1    Given the foregoing, the Court in this matter should find that the WAP was not

2   "unfunded." Accordingly, as the WAP was not "unfunded," it cannot qualify as a top-

3   hat plan.

4  **V.   RBC SET UP THE WAP IN BAD FAITH, AS PLAINTIFF IS**

5      **BEHOLDEN TO THE ARBITRARY AND CAPRICIOUS**

6      **DETERMINATIONS OF THE WAP COMMITTEE**

7    Plaintiff has grave concerns as to how RBC set up the WAP. First, RBC

8   bestowed full authority and discretion to the WAP Committee to decide the

9   conditions for vesting of Company Contributions to the WAP and conditions for their

10  distribution. Second, the WAP is **completely silent** as to the contingency of an

11  employee's termination ***without cause***, i.e., involuntary lay-offs and reductions in

12  force. While the WAP speaks to the vesting and distributions of Company

13  Contributions upon an employee's separation from RBC due to death, disability,

14  retirement, termination ***for cause***, and "restructuring," a huge gap exists as to

15  termination ***without cause.***

16    **A. THE WAP COMMITTEE WAS NOT SUBJECT TO PROPER**

17        **CHECKS AND BALANCES SO AS TO PROTECT WAP**

18        **BENEFICIARIES' INTERESTS**

19    Section 7.1 of the 2007 WAP states in part:

20       "The Committee has the **full power and sole discretionary**

21       **authority** to make all determinations provided for in the Plan,

22       including, without limitation, promulgating rules and

23       regulations as the Committee considers necessary or
appropriate for the implementation and manage of the Plan[.]"

24  (*See* AA 025.) (Emphasis added.)

25    As one can easily see, this poses major problems, as the RBC employees who

26  were charged with the WAP's ***administration*** were the same employees who were

27  responsible for its ***enforcement***. Compounding the problematic nature, is the fact that

28  said employees had "the full power and sole discretionary authority to make all

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

determinations provided for in the Plan." Simply put, at the time the WAP was in effect, there were no checks or balances in place to ensure the just enforcement of the WAP.

This lack of checks and balances is critical inasmuch as the Committee, as shown below, was charged with determining whether Plaintiff was fired due to restructuring.   In its WAP, RBC bestows plenary discretion to its Committee to determine whether an employee "ceases to be employed due to an organizational restructuring."

Indeed, Section 4.4 of the 2007 WAP provides:

> "In the event a participant ceases to be employed by the Company, any Participating Subsidiary and any other affiliate of the Company due to an organizational restructuring (**as determined in the sole discretion of the Committee**), all Mandatory Deferred Compensation in such participant's account shall become vested, but all unvested Company Contributions shall be forfeited."

(*See* AA 020.) (Emphasis added.)

However, nowhere in the WAP is the term "organizational restructuring" defined. Under 26 U.S.C. § 368(1), the following types of corporate transactions qualify as a corporate restructuring: 1) statutory mergers or consolidations; 2) acquisitions by one corporation, in exchange solely for all or a part of its voting stock; 3) transfers by a corporation of all or a part of its assets to another corporation; 4) recapitalizations; 5) a corporation's change in identity, form, or place of organization; or 6) a transfer by a corporation of all or part of its assets to another corporation in a title 11 or similar case.

First, as the term was never defined in the WAP, the Committee, a group of human resource employees, had the authority to give it the meaning that they, in their plenary discretion, wanted to it to mean.  In this case, the Committee got it wrong.  At the time of Plaintiff's termination from RBC, RBC was not undergoing a merger,

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

1   consolidation, transfer, recapitalization, change in identity or other corporate transfer
2   of any kind.  Rather, a large percentage of Plaintiff's work force, including Plaintiff,
3   in the Fixed Income Unit of RBC's Capital Markets Division was laid off without
4   cause.  Thus, under 26 U.S.C. § 368(1), there was no legal "restructuring" of any kind
5   that would justifiably permit the Committee to lump Plaintiff in that category.

6       Secondly, the Committee minutes are entirely **silent** as to any discussion of
7   "restructuring" – much less the reason for Plaintiff's termination.

8       In *Miller v. Eichleay Engineers, Inc., supra,* the court recognized that when a
9   pension plan is controlled by the employer – or in this case, a committee of personnel
10  charged with controlling the plan – "there is always an incentive for the
11  employer/administrator to deny benefits." *Miller, supra,* 886 F.2d at 33-34.

12      *Miller's* fear that an employer would be incentivized to deny plaintiffs their
13  due benefits was realized in this case.  Out of thin air, RBC's Committee provided a
14  completely unfounded reason for Plaintiff's termination and "lumped him" into an
15  inapplicable category so that RBC would not have to pay him the benefits to which he
16  was entitled.  This flies in the face of public policy and has forced Plaintiff to file the
17  instant lawsuit.

18  **B. THE  WAP  IS  COMPLETELY  SILENT  ON  THE  ISSUE  OF**
19  **TERMINATION WITHOUT CAUSE**

20      A review of the WAP reveals that relative to terminations, it only contemplates
21  termination *for cause* and is **completely silent** on the vesting and distribution of an
22  employee's benefits when such an employee is terminated *without cause*.  Aside from
23  termination *for cause,* the only other categories regarding an employee's separation
24  from the company are death, disability, retirement, or termination due to
25  restructuring. (*See* AA 019-020.)

26      Determination of this issue is critical, inasmuch as the WAP provides that in
27  the case of death, disability, or retirement, an employee's benefits shall vest and the
28  employee or his or her estate (in the event of death) shall receive his or her due

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

1  distributions. (*See* AA 019.)  In the event of termination *for cause*, the WAP provides

2  that all of the contributions and pension benefits of an employee participating in the

3  WAP are immediately forfeited and deemed returned to RBC. (*See* AA 020.)  In the

4  event of an employee's termination due to restructuring, all of the employee's

5  Mandatory Deferred Compensation shall become vested, but all Company

6  Contributions shall be forfeited. (*See* AA 020.)  Last, in a catch-all clause entitled

7  "Forfeitures," RBC (through its Committee) has complete power and authority to

8  forfeit any and all benefits "that are not vested on the participant's employment

9  termination date." (*See* AA 020.)

10      The simple question, to which there is no answer in the WAP, is: "How are an

11  employee's benefits treated if RBC simply decides to fire the employee without cause

12  before his benefits are due to vest?"  Why did RBC choose to be **completely silent** on

13  this contingency, when termination without cause is a common and frequent

14  occurrence in the business world?  RBC, a sophisticated financial institution,

15  presumably employed sophisticated attorneys to set up and draft the WAP.  As such,

16  RBC will be hard-pressed to claim that its **complete silence** on such a contingency

17  was simply overlooked – especially given the fact that the WAP was in effect since

18  2002.

19      Without specific language in the WAP addressing the vesting and distribution

20  of WAP benefits where an employee is terminated without cause – just like Plaintiff –

21  one cannot help but wonder whether RBC deliberatively and purposefully kept silent

22  on the issue so that when employees like Plaintiff were just months away from their

23  vesting and distribution date, RBC was free to randomly terminate such employees

24  without having to pay any benefits.  Plaintiff respectfully submits that this is exactly

25  what happened in the instant case.

26      As a result of the WAP's bad-faith set up, when Plaintiff was terminated

27  without cause, the Committee, in its sole and plenary discretion, wrongfully

28  categorized Plaintiff's termination, which, in turn, resulted in the wrongful forfeiture

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

1  of the Company Contributions to which he was, and continues to be, entitled.

2  **C. THE 2007 WAP LACKS AN INTEGRATION CLAUSE AND THUS**
3  **IS NOT THE ENTIRE AGREEMENT OF THE PARTIES.**

4  Both the 2006 and 2007 WAPs include identical language, stating: "The plan
5  formerly known as the RBC Dain Rauscher Wealth Accumulation Plan and (sic) was
6  amended and restated effective for the Plan Year beginning January 1, 2005 and was
7  further amended and restated effective for the Plan Year beginning on January 1,
8  2007." (*See* AA 033; AA 013.)

9  In *Satchwell v. Long John Silvers, Inc.*, 1992 U.S. App. LEXIS 9519 *8 (9th
10  Cir. 1992), the court held that when determining whether a document is an integrated
11  contract thus not susceptible to modification by parol evidence or other writings, the
12  court must consider whether it contains an integration clause.  The inclusion of an
13  integration clause suffices to preclude the court from considering the extrinsic
14  "factual matrix in which the contract was made." *Pannell Kerr Forster Int'l Ass'n v.*
15  *Quek*, 5 Fed. Appx. 574, 577 (9th Cir. 2001).

16  Here, while the two WAPs contain language regarding amendment and
17  restatement, the language is not sufficient to demonstrate an intent by the parties to
18  consider the 2007 WAP the entire agreement between the parties.  Thus, the Court
19  may properly consider the terms and provisions of all of the plans preceding the 2007
20  WAP.

21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

**VI.   CONCLUSION**

Based on the foregoing, Plaintiff STEVEN BENHAYON respectfully requests that this Court find that the WAP is not a top hat plan, and that the WAP was set up in bad faith to prevent or frustrate Plaintiff's entitlement to the vesting and distribution of benefits due to him under the WAP.

DATED: July 22, 2009          **BOHM, MATSEN, KEGEL & AGUILERA, LLP**

By: _____
Kari M. Myron
Matthew J. Salcedo,
Attorneys for Plaintiff STEVEN
BENHAYON

**PLAINTIFF'S OPENING BRIEF RE: ERISA ISSUES**

1

## PROOF OF SERVICE

2

3  STATE OF CALIFORNIA, COUNTY OF ORANGE

4  I am employed in the City of Costa Mesa, County of Orange, State of California.  I
5  am over the age of 18 years and not a party to the within action.  My business
   address is 695 Town Center Drive, Suite 700, Costa Mesa, California 92626.  On
6  July 22, 2009, I served the documents named below on the parties in this action as
7  follows:

8  DOCUMENT(S) SERVED:      **PLAINTIFF'S OPENING BRIEF RE: 1) NON-
                            APPLICABILITY OF ERISA'S TOP HAT
9                           EXEMPTION TO THE U.S. WEALTH
10                          ACCUMULATION PLAN; AND 2) DEFENDANTS'
                            EXECUTION OF THE U.S. WEALTH
11                          ACCUMULATION PLAN IN BAD FAITH**

12

13  SERVED UPON:      **SEE ATTACHED SERVICE LIST**

    ☐         (BY   PERSONAL   SERVICE)  I  **caused**  the  above-referenced
14            documents to be personally delivered on the date listed below.

15  ☒         (BY ELECTRONIC FILING WITH THE U.S. DISTRICT COURT)  By
16            submitting said documents for Electronic Case Filing on said date
              pursuant to Federal Rules of Civil Procedure 5(d)(3), Local Rule
17            5-4 and General Order 08-02, at Bohm, Matsen, Kegel & Aguilera,
18            LLP, 695 Town Center Drive, Suite 700, Costa Mesa, CA 92626.

19  ☒         (FEDERAL)  I declare that I am employed in the office of a member of
              the bar of this court at whose direction the service was made
20

21  Executed on July 22, 2009, at Costa Mesa, California.

22

23

24                                              Donald Shaw

25

26

27

28

1
2
3
4

## SERVICE LIST

### *Benhayon vs. Royal Bank of Canada, et. al.*
**United States District Court, Central District of California**
**Case No. CV08-06090-FMC (AGRx)**

5

Interested Parties

| | |
|---|---|
| Linda Claxton, Esq.<br>OGLETREE DEAKINS NASH SMOAK &<br>STEWART<br>633 West Fifth Street, 53rd Floor<br>Los Angeles, CA 90071<br>P: 213-239-9800<br>F: 213-239-9045<br>Linda.claxton@ogletreedeakins.com | Attorney for Royal Bank of Canada<br>US Wealth Accumulation Plan |
| The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801 | Agents for Service for Dain Rauscher<br>Incorporated |

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PROOF OF SERVICE